IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON

PHYLLIS RENEE BROWN,               )
                                   )
          Plaintiff/Respondent,    ) Shelby Circuit No. 136582 R.D.
                                   )
VS.                                ) Appeal No. 02A01-9709-CV-00228
                                   )
CHARLES CHANDLER BROWN, SR.,       )
                                   )
          Defendant/Petitioner.    )

FILED

November 2, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

APPEAL FROM THE CIRCUIT COURT OF SHELBY COUNTY
AT MEMPHIS, TENNESSEE
THE HONORABLE JAMES F. RUSSELL, JUDGE

JOY TANNER BOMAR
Memphis, Tennessee
Attorney for Petitioner


JOHN D. HORNE
Memphis, Tennessee
Attorney for Respondent

AFFIRMED AS MODIFIED

ALAN E. HIGHERS, J.

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

DAVID R. FARMER, J. (concurs separately)

Charles Chandler Brown, Sr. (Father), appeals the trial court's order denying his petition to modify the custody arrangement previously agreed to by the parties and set forth in their final divorce decree. For the reasons stated hereinafter, we affirm the trial court's judgment with certain modifications.

## I. Factual and Procedural History

The parties were divorced in December 1991. Per the parties' agreement, Phyllis Renee Brown (Mother) was awarded custody of the parties' minor child, Charles Chandler Brown, Jr. (Chandler), then four years of age. The Father was awarded specified visitation, including every other weekend, beginning at 6:00 p.m. on Friday and ending at 6:00 p.m. on Sunday, and five weeks in the summer.

The Mother was remarried in April 1992 to Joe Omedeo. The Mother began seeing Omedeo while she was still married to the Father and, at the time of her remarriage, the Mother already was pregnant with Omedeo's child. Despite the Mother's remarriage, the Father and the Mother maintained a sporadic sexual relationship over a period of almost three years. These sexual encounters began in August 1992, when the Mother was seven months pregnant with Omedeo's child, and continued until July 1995. During one or two such encounters, the Father videotaped the Mother engaging in sexual activity in the Father's

2

kitchen. Chandler was present in the Father's home during the taping, but he apparently did not witness the sexual activity.

The Mother's second child, Joey Omedeo, was born in November 1992. The Mother's marriage to Joe Omedeo was short-lived, however, and she filed for divorce in June 1993. The Mother's sexual relationship with the Father finally ended during the summer of 1995, when she met her current paramour, Richard Stacey. One evening when the Father was returning Chandler from visitation, the Father encountered Joe Omedeo, and the two men began talking. In response to a specific question from Omedeo, the Father admitted that he had engaged in sexual relations with the Mother. The Father also answered other questions posed to him by Omedeo. As a result of this exchange of information, the Father agreed to appear in a Mississippi court and testify on behalf of Omedeo, who was seeking custody of Joey Omedeo.

In February 1996, the Father filed this petition to change custody of Chandler from the Mother to the Father. In support of his petition, the Father alleged the following changes of circumstances:

> 3.     That since the entry of the Final Decree of Divorce, the Mother has remarried and has had another child. Further, the Mother has set about a course of conduct, which is detrimental to the best interests of the minor child, including, without limitation, having extramarital affairs and [cohabiting] with a man -- not her husband.

> 4.     That the Mother is presently in a custody dispute over similar issues involving her second child born to the Mother since the entry of the Final Decree in this matter.

> 5.     That upon information and belief, the Mother's present paramour has physically abused the minor child, and the Mother herself is guilty of using implements (switches) on the minor child for discipline. Additionally, the Mother does not provide proper supervision for the minor child in the apartment complex where she lives, either after school or during the

summer vacation months, nor does she provide the minor child with adequate funds with which to buy lunches at school.

6. Since the [Mother's] involvement with her present paramour, and even more so since the [Father] has been subpoenaed to testify in the collateral custody case, the Mother has set about a pattern of interference with [the Father's] physical contact and telephone visitation with the minor child.

In his petition, the Father moved for the appointment of a guardian ad litem to represent Chandler's interests. The trial court granted the motion, appointing attorney Pamela Pierce as Chandler's guardian ad litem.

Sometime between January and April 1996, the Father testified in the Mississippi custody proceedings involving Joey Omedeo. In addition to testifying about his affair with the Mother while she still was married to Omedeo, the Father provided Omedeo with the sexually explicit videotape he had taken of the Mother in his kitchen, and Omedeo played the videotape in the courtroom during the trial. In November 1996, the Mississippi court awarded Omedeo custody of Joey Omedeo, who was then four years of age. In support of its ruling, the Mississippi court relied, in part, on the Father's testimony and the videotape. The Mother's divorce from Omedeo became final in December 1996.

In December 1996, the trial court in this case entered a temporary order which, in addition to continuing the case until after the 1996-97 school year, responded to concerns expressed by the Guardian Ad Litem in her initial report by imposing several conditions on the parties' behavior pending these proceedings. One of the conditions was that the parties engage in family counseling with Dr. Roy Greenberg, who already was treating Chandler. The trial court also imposed, inter alia, the following conditions on the parties:

- The parties shall call Chandler no more than once per day while the child is in the care of the other parent, and

4

those calls should be placed to Chandler between the hours of 7 p.m. and 8 p.m. Missed calls to the child will be returned the same day and prior to the child's bedtime. The calls should be limited in length so as not to interfere with the consistency of the child's evening preparation for school and bedtime. This does not limit letters, post cards, cards or E-mail to the child from either parent.

- . . . Both parents are to deposit Twenty-Five ($25.00) Dollars with the school office or teacher to cover forgotten or unpaid lunch money and/or school supplies.

- . . . .

- Neither parent is to discuss the other parent in Chandler's listening presence. To the extent possible, each parent is to prevent other family members or friends from discussing the other parent in Chandler's listening presence.

- . . . [N]either parent is to discuss these proceedings, their progress or their results with Chandler. The parents are authorized only to refer Chandler to the Guardian ad Litem or to Dr. Greenberg to obtain answers to his questions.

- Neither parent is to smoke in Chandler's presence, at any place or at any time, whether indoors or otherwise.

- Neither parent is to have an adult member of the opposite sex, who is unrelated to that parent, remain in the home with Chandler present past 10 p.m. or arrive in the home prior to Chandler's breakfast.

In addition to imposing these conditions, the trial court increased the Father's visitation time with Chandler. Whereas the Father's visitation weekends with Chandler formerly began on Friday at 6:00 p.m. and ended on Sunday at 6:00 p.m., the trial court's temporary order provided that such visitations would begin "Thursday after school" and end "the following Monday morning." Additionally, on alternate weeks, the Father was granted visitation with Chandler "from Thursday after school and overnight until the next morning."

The trial relative to Chandler's custody took place in July 1997. During the trial, the Mother admitted that she had permitted her paramour, Richard Stacey, to spend at least two

5

nights in her apartment while Chandler was present in the home. The Mother testified that Stacey also came to the apartment every morning to drink coffee with her on the patio. The Mother denied that Stacey ever physically disciplined Chandler, but she acknowledged that, in the past, Stacey had made Chandler sit in "time out" for misbehaving. Moreover, the Mother admitted that she once had lied when the Guardian Ad Litem asked her if Stacey had spent the night and that she had committed perjury in the Mississippi custody proceedings. The Mother admitted smoking in Chandler's presence, but she maintained that this only occurred outdoors and was unavoidable because Chandler insisted on being around her. Finally, the Mother admitted that she had talked to Chandler about losing custody of Joey Omedeo and that she had told Chandler that the Father was at least partly to blame for this loss.

The Father admitted that he too had smoked in Chandler's presence, but he insisted that this occurred only when he was outdoors or when he was "in the back" and Chandler was "at the other end of the house." The Father also admitted that he had declined to keep Chandler during the day that summer, despite the fact that the Father was unemployed for several months. The Father defended his refusal by explaining that he was helping his new wife start her own business. The Father complained that Chandler rarely returned his phone calls, and he appeared to blame the Mother for this circumstance.

Psychologist Roy Greenberg testified that the family therapy ordered by the trial court ended when the parties reached an impasse in their communications regarding Chandler's welfare. Specifically, the Mother still harbored hostility and resentment toward the Father for his participation in the Mississippi custody proceedings, and she expressed her belief that she could never forgive the Father for his role in her loss of custody of Joey. Dr. Greenberg

6

was concerned about the effect of the custody proceedings on Chandler because the Mother had discussed the proceedings with Chandler and had communicated her grief over the loss of Joey's custody.

Dr. Greenberg noted that, early in the Mother's relationship with Richard Stacey, Chandler complained that Stacey was punishing him. Dr. Greenberg raised this issue with the Guardian Ad Litem, however, and he believed that the problem had been resolved. The Mother herself had been excessive and overly negative in her disciplining of Chandler, but Dr. Greenberg testified that this problem was addressed and, at least with regard to any physical punishment, resolved before the Father filed his petition to change custody. Dr. Greenberg also noted that previous father figures in Chandler's life had left, i.e. the Father and Joe Omedeo, and he expressed concern about the effect that such abandonment might have on Chandler.

Despite these concerns, Dr. Greenberg testified that Chandler was "a happy child" who was "coping very well." With the exception of stress associated with the custody proceedings, Dr. Greenberg did not believe that Chandler was "exhibiting or experiencing any trauma, duress or crisis at this time." Dr. Greenberg opined that Chandler would "do well in either [parent's] home," and he declined to characterize the environment in the Mother's home as either healthy or unhealthy. Dr. Greenberg explained that "[i]t's not abusive, it's not chaotic, there is love and support, there are things that probably are worth changing, sure, and I think that is true in a lot of households." Dr. Greenberg also declined to give an opinion as to whether a change of custody would be harmful to Chandler, but he did opine that Chandler "feels great love towards [the Mother] and it just follows that any child removed from a parent [he] love[s] is going to be hurt." Although Dr. Greenberg expressed his concern

7

over the Mother's failure to follow through with therapy recommendations, Dr. Greenberg testified that the Mother had worked very hard, that she was truthful about her failures to accomplish therapy goals, and that she did not blame others for these failures.

The Guardian Ad Litem agreed that Chandler was "not an abused child." The Guardian Ad Litem testified that, although Richard Stacey had disciplined Chandler harshly in the past, such discipline did not rise to the level of abuse. By the time of trial, Stacey no longer was disciplining Chandler. The Father's new wife, Deborah Brown, also had played a disciplinary role in Chandler's life, but the Guardian Ad Litem believed that Chandler had adjusted well to the Father's remarriage and to the new rules established in the Father's home. Chandler had benefited from the increased visitation with the Father as provided in the trial court's temporary order.

The Guardian Ad Litem expressed concern over the failure of both parents to fully comply with the trial court's prohibition on smoking in Chandler's presence. The Guardian Ad Litem also expressed concern over the degree to which the Mother had involved Chandler in the custody proceedings. At one point, the Guardian Ad Litem urged the Mother to seek counseling to deal with her anger over the loss of custody of Joey instead of communicating this anger to Chandler. The Guardian Ad Litem testified that Chandler "very much still mourn[ed] the loss of Joey," and she believed that neither parent had adequately addressed this loss.

Although the Guardian Ad Litem declined to make a custody recommendation, she did not believe that an immediate or drastic change in custody or visitation would be in

8

Chandler's best interest. The Guardian Ad Litem recommended that any changes be accomplished gradually and with the guidance of a counselor.

At the trial's conclusion, the trial court found that the Father had failed to carry his burden of proof to support a change of custody and, accordingly, the court entered an order denying the Father's petition. Specifically, the trial court made the following findings:

> The proof with respect to interference with telephone contact, unreturned telephone calls, the proof from [the Father] was that he would call and leave messages on an answering machine that were not returned. The reason for their not being returned is unknown to the Court. It could be that Chandler simply did not want to return the telephone calls as far as this Court could tell. In any event, if they were prevented by [the Mother], the Court [would] not base a change of custody on that alone.

> There's the allegation regarding the use of switches for discipline or improper supervision or adequate funds for school lunches. There was a suggestion or an order, part of a temporary order, that each of the parties deposit $25 for the assistance of things at school. There's no indication from any of the evidence or of the proof that that's been a problem.

> With regard to inappropriate discipline, it appears to the Court through work with Dr. Greenberg that whether it might have been inappropriate under those circumstances, as they come up, they get corrected. That includes the allegations of physical abuse from the paramour, Mr. Stacey. The proof has not got beyond the admissions by Mr. Stacey with respect to earlier disciplinary measures after learning that his involvement was not appropriate to the Court.

> Then there's the custody dispute in Mississippi over similar issues and the extramarital affairs and cohabiting. The Court can only wonder what must have been going through [the Father's] mind during that period from the time of the divorce through the Mississippi divorce proceedings. The fact that he was engaged in an ongoing relationship and affair with his ex-wife indicates to the Court that he had little regard for her marriage at the time. . . .

> . . . [T]he Court finds that the Mississippi Court based his ruling and award of custody of Joey Omedeo to Mr. Omedeo . . .

9

in large measure upon the testimony and behavior that was elicited through [the Father]. In that case, custody was awarded apparently to Mr. Omedeo based in large measure upon evidence of [the Father's] ongoing relationship with his ex-wife, the very conduct of which he complains of framing the basis for a change of circumstances in this case.

There is the matter of the video. [The Father] says that [the Mother] consented to the video because she believed it was a birthday gift to him, if the Court understands the testimony correctly. The Court only wonders how this might have been different if [the Father's] ultimate goal, that is, the return of his ex-wife and child to his home, had occurred, then where we would be?

Then the Court has to consider the effect of change upon a child. The Court is most persuaded by the testimony of Dr. Greenberg where he says the child is coping and the child's only stress is the ongoing litigation involving his mother and he feels it would be hurtful for the child to be removed from the mother at this time.

The Court is, therefore, of the opinion that [the Father] failed to carry the burden of proof; therefore, there will be no change of custody.

## II. The Change of Custody Issue

A trial court's initial award of custody remains "subject to such changes or modification as the exigencies of the case may require." T.C.A. § 36-6-101(a)(1) (Supp. 1997). A judgment or order awarding custody, however, "is res judicata as to the facts in existence at the time of the award." Eberhart v. Eberhart, No. 03A01-9612-CV-00374, 1997 WL 406378, at *2 (Tenn. App. July 22, 1997). Accordingly, a party seeking to change the custodial arrangement bears the burden of proving that a material change in circumstances has occurred since entry of the initial custody decree. Musselman v. Acuff, 826 S.W.2d 920, 922 (Tenn. App. 1991).

10

In Musselman v. Acuff, 826 S.W.2d 920 (Tenn. App. 1991), this court set forth the standard of review in custody modification proceedings:

> The scope of review in custody cases is de novo upon the record accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Hass v. Knighton, 676 S.W.2d 554 (Tenn. 1984). The paramount consideration in a custody proceeding is the best interest of the child. When the issue before the Court is whether to modify a prior custody order, it need not repeat the comparative fitness analysis that is appropriate at the time of the original custody [decree]. See e.g., Bah v. Bah, 668 S.W.2d 663 (Tenn. App. 1983). Instead, in a modification proceeding, the trial judge must find a material change in circumstances that is compelling enough to warrant the dramatic remedy of changed custody. See, Tenn. Code Ann. § 36-6-101(a); Woodard v. Woodard, 783 S.W.2d 188 (Tenn. App. 1989); Dailey v. Dailey, 635 S.W.2d 391 (Tenn. App. 1981). Moreover, the burden is on the non-custodial parent to prove changed circumstances.

Musselman, 826 S.W.2d at 922.

Because a change of custody is considered a "drastic legal action," not every change in circumstances will be sufficiently material to warrant modification of a prior custody decree. Eberhart v. Eberhart, 1997 WL 406378, at *2 (quoting Musselman v. Acuff, 826 S.W.2d at 923). No "hard and fast" rule exists as to what constitutes changed circumstances. Dantzler v. Dantzler, 665 S.W.2d 385, 387 (Tenn. App. 1983). The party seeking a change of custody, however, must prove that "some new fact has occurred which has altered the circumstances in a material way so that the welfare of the child requires a change of custody." Griffin v. Stone, 834 S.W.2d 300, 302 (Tenn. App. 1992). In order to be compelling enough to warrant the dramatic remedy of changed custody, the change of circumstances must be such that "continuation of the adjudicated custody will substantially harm the child." Wall v. Wall, 907 S.W.2d 829, 834 (Tenn. App. 1995).[1] When the requested modification is

---

[1] In Wall v. Wall, supra, permission to appeal was denied by the Supreme Court. The Wall case has been followed consistently by the Court of Appeals, including the

11

based on the behavior of the custodial parent, such behavior must clearly posit or cause danger to the mental or emotional well-being of the child. <u>Musselman v. Acuff</u>, 826 S.W.2d at 924 (quoting <u>Ballard v. Ballard</u>, 434 So. 2d 1357, 1360 (Miss. 1983)).

Applying the foregoing standard, we affirm the trial court's decision to deny the Father's petition to change custody. Regarding many of the changes in circumstances alleged by the Father, the trial court found that the Father simply failed to carry his burden of proof, and we conclude that the evidence does not preponderate against such a finding. Although Richard Stacey and the Mother had punished Chandler inappropriately in the past, the evidence showed that this problem had been addressed and largely resolved by the time of trial. The evidence showed that both parties had violated the temporary order's prohibition against smoking in Chandler's presence. The proof failed to support the Father's contention that the Mother neglected to provide Chandler with adequate funds to buy lunches and other needed items at school,[2] or that the Mother prevented Chandler from returning the Father's telephone calls.

We are concerned, however, by certain events which were proven to have transpired since entry of the initial custody decree. The record contains undisputed evidence that the Mother engaged in extramarital affairs which contributed to the failure of her marriage to Joe

---

following: <u>Greene v. Greene</u>, No. 03A01-9503-CV-00091, 1996 WL 165098 (Tenn. App. April 9, 1996); <u>Ingram v. Ingram</u>, No. 02A01-9501-CH-00005, 1996 WL 138443 (Tenn. App. Mar. 27, 1996); <u>Stroud v. Stroud</u>, No. 01A01-9607-CH-00291, 1997 WL 266846 (Tenn. App. May 21, 1997); <u>Stubbs v. Stubbs</u>, No. 02A01-9703-CH-00050, 1997 WL 266846 (Tenn. App. Nov. 25, 1997); <u>Cook v. Davidson</u>, No. 02A01-9607-CH-00173, 1997 WL 459727 (Tenn. App. Aug. 12, 1997); <u>Eberhart v. Eberhart</u>, No. 03A01-9612-CV-00374, 1997 WL 406378 (Tenn. App. July 22, 1997); <u>Williams v. Williams</u>, No. 01A01-9610-CV-00468, 1997 WL 272458 (Tenn. App. May 23, 1997).

[2] The Guardian Ad Litem 's initial report indicated that Chandler's teachers agreed the forgotten money and supplies were "no more than any average kid."

12

Omedeo and the resulting loss of another father figure in Chandler's life. The Mother additionally admitted that she had involved Chandler in custody proceedings by discussing the proceedings with Chandler and telling him that the Father was partly to blame for the proceedings' outcome. Both Dr. Greenberg and the Guardian Ad Litem expressed concerns that these circumstances had harmed Chandler.

Nevertheless, we affirm the trial court's refusal to change custody. Although Dr. Greenberg and the Guardian Ad Litem agreed that the foregoing events had harmed Chandler, their testimony also indicated that a change in custody would not necessarily benefit Chandler at the present time. The Guardian Ad Litem did not believe that an immediate or drastic change in custody or visitation would be in Chandler's best interests. Dr. Greenberg testified that Chandler was "a happy child" who would "do well in either home" and, further, that the Mother's household, despite some problems, provided Chandler with love and support. When given the opportunity, Dr. Greenberg declined to characterize the environment in the Mother's home as an unhealthy one. Dr. Greenberg reported that, with the exception of stress associated with the custody proceedings, Chandler did not appear to be experiencing any particular "trauma, duress or crisis at this time."

While we do not wish to condone the type of behavior which may have precipitated this litigation, we also are mindful that custody decisions should not be designed to punish one parent or to reward the other. Wall v. Wall, 907 S.W.2d 829, 834 (Tenn. App. 1995). Instead, our paramount concern remains the welfare and best interest of the minor child. In re Parsons, 914 S.W.2d 889, 893 (Tenn. App. 1995). In the absence of any competent testimony

13

that a continuation of the current custody arrangement presents a danger of substantial harm to Chandler, we decline to disturb the trial court's decision to deny a change of custody.[3]

In affirming the trial court's decision, we also feel compelled to point out that the Father himself played a role in some of the events which he contended constituted changes in circumstances. The Father admitted that he engaged in a course of sexual conduct with the Mother which only could have undermined, rather than preserved, her marriage to Joe Omedeo. Moreover, the record contains evidence that the Father voluntarily involved himself in the Mississippi custody proceedings whereby the Mother lost custody of Joey Omedeo and Chandler lost the companionship of his only brother.

In challenging the trial court's denial of his petition, the Father contends that the trial court erred in failing to place greater emphasis on the Mother's veracity. At trial, for example, the Mother admitted that she had been dishonest on at least two occasions, once when she lied to the Guardian Ad Litem about Richard Stacey spending the night in her apartment and,

_____

[3]The principle enunciated in Wall v. Wall, *supra*, is not at odds with the traditional "best interests" test. Ping-pong custody adjudications are not in a child's best interests. This problem has been addressed with unanimity by Aaby, Musselman, and Contreras, as well as by Wall. Aaby, a parental relocation case, specifically held that "Tennessee allows custody to be changed if the behavior of the custodial parent clearly posits a danger to the physical, mental or emotional well-being of the child [citation omitted]." [Emphasis supplied]. Aaby v. Strange, 924 S.W.2d 623, 629 (Tenn. 1996). Musselman, citing Ballard v. Ballard, 434 So.2d 1357, 1360 (Miss.1983), held: "It is only that behavior of a parent which clearly posits or causes danger to the mental or emotional well-being of a child...which is sufficient basis to seriously consider the drastic legal action of changing custody." [Emphasis supplied]. Musselman v. Acuff, 826 S.W.2d 920, 924 (Tenn. App. 1991). Contreras, quoting Sartoph v. Sartoph, 354 A.2d 467, 473 (Md. App. 1976), stated: "The custody of children should not be disturbed unless there is some strong reason affecting the welfare of the child. To justify a change in custody, the change in conditions must have occurred which affects the welfare of the child and not that of the parents." [Emphasis supplied]. Contreras v. Ward, 831 S.W.2d 288, 290 (Tenn. App. 1991). These cases are all in accord with the language of Wall v. Wall, *supra*, that, once a valid custody determination is made, such custody is not subject to change unless there is a "change of circumstances...which requires a change to prevent substantial harm to the child." Wall v. Wall, 907 S.W.2d 829, 834 (Tenn. App. 1995). "In short, when all goes well with children, stability, not change, is in their best interests." Contreras v. Ward, *supra*, citing Sartoph v. Sartoph.

14

again, when she committed perjury in the Mississippi custody proceedings involving Joey Omedeo.

We recognize that a "parent's honesty reflects on his or her fitness to be a good custodian." Gaskill v. Gaskill, 936 S.W.2d 626, 634 (Tenn. App. 1996). We note, however, that this character trait is merely one of the factors to be considered by the trial court in making its custody determination, and that a parent's veracity, or lack thereof, does not necessarily control the outcome of a custody proceeding. See, e.g., Rubin v. Kirshner, 948 S.W.2d 742, 746 (Tenn. App. 1997); Stroud v. Stroud, No. 01A01-9607-CH-00291, 1997 WL 266846, at *4 (Tenn. App. May 21, 1997). We also note that the trial court made no negative findings concerning the Mother's credibility in this case. In fact, the trial court's findings suggest just the opposite because, in denying the Father's petition, the court cited Dr. Greenberg's testimony that the Mother had been truthful about her failures to accomplish certain therapy goals.

Although we affirm the trial court's order denying the Father's petition, we agree that Chandler's best interests require the continued effectiveness of some of the conditions imposed in the trial court's temporary order.[4] Accordingly, we modify the trial court's final order to include the following conditions:

> - The parties shall call Chandler no more than once per day while the child is in the care of the other parent, and those calls should be placed to Chandler between the hours of 7:00 p.m. and 8:00 p.m. Missed calls to the child will be returned the same day and prior to the child's bedtime. The calls should be limited in length so as not to interfere with the consistency of the child's evening preparation for school and bedtime. This does not limit letters, post cards, cards, or E-mail to the child from either parent.

---

[4] The temporary order and the final order were entered by different trial judges.

15

-   Neither parent is to discuss the other parent in Chandler's listening presence.  To the extent possible, each parent is to prevent other family members or friends from discussing the other parent in Chandler's listening presence.

-   Neither parent is to discuss these (or any other) custody proceedings, their progress, or their results with Chandler.

-   Neither parent is to smoke in Chandler's presence, at any place or at any time, whether indoors or otherwise.

-   Neither parent is to have an adult member of the opposite sex who is unrelated to that parent remain in the home with Chandler present past 10:00 p.m. or arrive in the home prior to Chandler's breakfast.

We also modify the trial court's final order to reinstate the visitation schedule set forth in the trial court's temporary order, which provided that the Father "shall have Chandler every other weekend from Thursday after school until the following Monday morning, at which time the Father shall deliver Chandler to school" and that, on alternate weeks, the Father "shall have Chandler from Thursday after school and overnight until the next morning at which time the Father shall deliver Chandler to school."  The record indicates that Chandler has benefited from this increased visitation time with the Father.

### III.  Costs and Other Issues

On appeal, the Father also contends that the trial court erred in designating the fees due to the Guardian Ad Litem and the Attorney Ad Litem as costs rather than as child support.[5]  Rule 17.03 of the Tennessee Rules of Civil Procedure authorizes the trial court, in

---

[5] Apparently, the Father is attempting to raise this issue on behalf of the Guardian Ad Litem and the Attorney Ad Litem.  The Guardian Ad Litem was listed, along with the Father, as an appellant in a joint notice of appeal filed by the Father's attorney and the Attorney Ad Litem.  Additionally, the Attorney Ad Litem's signature appears on the appellate brief filed by the Father's attorney.  The brief does not make clear, however, whether the Guardian Ad Litem is joining in all of the issues raised in the Father's brief, or just the issue concerning costs.

its discretion, to award the Guardian Ad Litem a reasonable fee for her services, which fee is "to be taxed as costs." T.R.C.P. 17.03.[6] We have found no authority, and the Father has cited no authority, which permits the trial court to designate such fees as child support rather than as costs. The authority of the trial court to order a party to make child support payments is statutory. See Blackburn v. Blackburn, 526 S.W.2d 463, 466 (Tenn. 1975); see also Towner v. Towner, 858 S.W.2d 888, 890 (Tenn. 1993); Penland v. Penland, 521 S.W.2d 222, 224 (Tenn. 1975); Noble v. Stubblefield, 755 S.W.2d 454, 458 (Tenn. App. 1988). In the absence of such statutory authority, we conclude that the trial court properly assessed these fees as costs.

The Mother has raised issues concerning the trial court's failure to award her attorney's fees and the court's assessment of one-half of the costs against her. Although the prevailing party in a civil action generally is entitled to an award of costs (see T.C.A. § 20-12-101 (1994); T.R.C.P. 54.04(1)), this rule is not absolute. The assessment of costs lies within the reasonable discretion of the trial court, and the court may apportion costs between the parties as the equities of each case demand. Perdue v. Green Branch Mining Co., 837 S.W.2d 56, 60 (Tenn. 1992); T.C.A. § 20-12-119 (1994); T.R.C.P. 54.04(2).

In this case, we find no abuse of discretion in requiring the Mother to pay one-half of the costs incurred in these proceedings. We recognize that the Mother was the prevailing party below. The testimony of both Dr. Greenberg and the Guardian Ad Litem, however, reveals that the Father's modification petition was prompted at least in part by legitimate concerns for Chandler's welfare. Although the Father ultimately failed to meet his burden of

---

[6]Both parties appear to agree that this authorization includes the Attorney Ad Litem's fee.

17

proving that these concerns required a change of custody, we conclude that the trial court acted within its equitable discretion in requiring each of the parties to pay one-half of the costs.

We likewise conclude that the trial court did not abuse its discretion in denying the Mother's request for an award of attorney's fees. The Mother's request for attorney's fees was governed by Tennessee Code Annotated section 36-5-103(c), which authorizes the trial court to award attorney's fees to a party who successfully pursues or defends a change of custody petition. See D v. K, 917 S.W.2d 682, 686 (Tenn. App. 1995); Gaddy v. Gaddy, 861 S.W.2d 236, 241 (Tenn. App. 1992); Akins v. Akins, 805 S.W.2d 377, 379-80 (Tenn. App. 1990); Fenley v. Fenley, No. 03A01-9604-CH-00121, 1996 WL 469683, at *4 (Tenn. App. Aug. 19, 1996). As with an award of costs, however, a prevailing party's right to an award of attorney's fees under this section is not absolute. Deas v. Deas, 774 S.W.2d 167, 169-70 (Tenn. 1989). Instead, the statute provides that such an award lies within the trial court's discretion. See T.C.A. § 36-5-103(c) (1996); see also Sherrod v. Wix, 849 S.W.2d 780, 785 (Tenn. App. 1992); Archer v. Archer, 907 S.W.2d 412, 419 (Tenn. App. 1995); Brewer v. Brewer, 869 S.W.2d 928, 936 (Tenn. App. 1993); Florian v. Edenfield, No. 03A01-9406-CV-00217, 1996 WL 310018, at *5 (Tenn. App. June 11, 1996). The trial court's decision to award or deny attorney's fees must only be just and equitable under the circumstances of each case. Sherrod v. Wix, 849 S.W.2d at 785; Bjork v. Bjork, No. 01A01-9702-CV-00087, 1997 WL 653917, at *7 (Tenn. App. Oct. 22, 1997). As with the trial court's assessment of costs, we conclude that, under the circumstances of this case, the court acted within its equitable discretion in denying the Mother's request for attorney's fees.

18

## IV. Conclusion

As modified, the trial court's judgment is hereby affirmed. Costs of this appeal are taxed to the Father, for which execution may issue if necessary.

_____
HIGHERS, J.

CONCUR:

_____
CRAWFORD, P.J., W.S.

_____
FARMER, J. (concurs separately)

19